UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-cv-610-FDW
(3:11-cr-373-FDW-DSC-10)

| | |
|---|---|
| NASSER KAMAL ALQUZA, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | ORDER |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |
| ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), and on the Government's Motion for Summary Judgment, (Doc. No. 5).

**I.     BACKGROUND**

**A. Petitioner Nasser Kamal Alquza and Qazah conspire to traffic in stolen cigarettes and to launder the proceeds.**

In 2010, Petitioner's nephew, Kamal Zaki Qazah, began purchasing purportedly stolen cigarettes from undercover officers. (Crim. Case No. 3:11-r-373-FDW-DSC-10, Doc. No. 289 at 108-09, 124-25: Trial Tr. I).[1] In April 2011, Qazah told undercover officers that, for a fee, his uncle (Petitioner) could launder large amounts of cash, approximately $100,000 every couple of months, by running the cash through different businesses. (Id., Doc. No. 291 at 600-02: Trial Tr. III). Petitioner and Qazah met with undercover officers in May 2011 and discussed the sale of additional stolen cigarettes, as well as options for concealing the nature and source of the

---

[1] Citations are to the original page numbers in the trial transcripts.

1

proceeds generated by those sales. (Id. at 614-15). In Petitioner's presence, Qazah discussed purchasing 800 or more cases of cigarettes per month from the officers at prices between $1,200 and $1,500 per case. (Id. at 619-21). An undercover officer commented during the discussion, "What's a few stolen smokes amongst friends." (Id. at 631). Petitioner stated, "My nephew has been doing this job [referring to his cigarette business] and then needed me and then told me about it." (Id. at 625). Petitioner explained that he was "a moneyman," id. at 633, and offered several different ways he could launder cash, including writing checks from different businesses that Petitioner owned or controlled. (Id. at 623). For a larger fee, Petitioner offered to launder as much as $200,000 cash through overseas accounts that he claimed to own in London, Jordan, and Paris. (Id. at 634).

Petitioner discussed his past money-laundering experience with the undercover officers and gave them specific advice on how to avoid law enforcement. (Id., Doc. No. 292 at 826-27: Trial Tr. IV). Petitioner stated that he had previously laundered money for people he trusted for "two or three years." (Id. at 773-74). Petitioner revealed his past experience with stolen baby formula, which he suggested was "something else [the officers] could get into besides the stolen cigarettes business." (Id. at 775). Petitioner assured the officers, "I have been doing this for a while. I have been doing it while I was living in Kentucky for the same hot shit that you guys do, and it was formula milk." (Id. at 775-76).

In June 2011, undercover officers met with Petitioner to launder $50,000 in cash from their sale of purportedly stolen cigarettes to Qazah. (Id., Doc. No. 291 at 650). Petitioner gave the officers five checks totaling $47,000, drawn on accounts in the name of Petitioner and his wife. (Id. at 651-58). In July 2011, Qazah delivered checks from Petitioner to replace two earlier checks that the bank would not cash. (Id. at 668). Officers later called Petitioner to

2

confirm receipt and to advise Petitioner that they had more cash from "hot smokes" to launder. (Id. at 673-74). In August 2011, the undercover officers met Petitioner at his pizza business, Milano's Pizza, and gave him $75,000 cash in exchange for four checks totaling $70,400. (Id., Doc. No. 292 at 798-802). Petitioner wrote "Subway Equipment," "Oven," and "Hood Installation," respectively, on the checks. (Id. at 803-05).

During a September 15, 2011, cigarette transaction at Petitioner's shopping center, the undercover officers discussed additional money laundering with both Petitioner and Qazah. (Id. at 806-07, 817). Petitioner agreed to take amounts up to $100,000, but stated that any amount over that would have to go "overseas." (Id. at 817). On October 20, 2011, undercover officers brought $125,000 cash in a toolbox to Petitioner and Qazah at Milano's Pizza. (Id. at 825). In exchange, Petitioner gave the officers six checks drawn on his Subway business account, payable to JROX Construction—a shell company. (Id. at 827-30). Petitioner had suggested that the officers create entities and use different business names and aliases that would not be associated with them or their illegal operations. See (Id.). The undercover officers had created JROX after Petitioner told them their prior company name, "Fast Eddie's Tobacco," was too closely associated with their illegal business. See (Id. at 753-54, 825-28, 898). During the meeting, Petitioner also told officers that they "can't do this forever as far as stolen cigarettes," but suggested that "they could start a new business with stolen baby formula and he had contacts that could help them." (Id. at 831-35).

In November 2011, after officers had expressed skepticism about dealing in baby formula, Petitioner drove the officers to a local Walmart, where he showed them the brands of baby formula that were the easiest to steal and sold the best on the black market. (Id. at 836-37, 842). Petitioner explained how undercover officers could make more money if they had a secret

3

location where they could bring hijacked trailer loads of baby formula. (Id. at 842-43).

**B. Petitioner and Qazah are arrested and charged with trafficking in stolen goods and money laundering.**

Undercover officers arranged to deliver more than $1 million in cigarettes to Qazah at Petitioner's shopping center on November 30, 2011. Undercover officers initially informed Qazah that they could obtain 1,377 master-cases, which they would sell for $1.8 million. (Id. at 913). Qazah said that he could only get $1.2 to $1.3 million, but that he would come back later for the rest of the cigarettes. (Id.). Instead of delivering the cigarettes, law enforcement officers arrested Petitioner and Qazah at Qazah's residence, where they executed a search warrant and found approximately $1.3 million. (Id. at 918-19). Officers also executed a search warrant at Petitioner's residence, id., doc. no. 293 at 998-1010, where they recovered United States and Jordanian passports in Petitioner's name; multiple identification documents that bore Petitioner's picture, but the name Saio Quza, whom Qazah identified at trial as Petitioner's brother; social-security cards in the names of both Petitioner and Qazah; and credit cards in Qazah's name. (Id., Doc. No. 236 at 31). Officers also recovered checkbooks and checks in Petitioner's name from several banks, including those used for the transactions with the undercover officers, a record of an international wire transfer to Pakistan, and a statement from the Cairo Amam Bank. (Id., Doc. No. 292 at 41; Doc. No. 293 at 1014-20, 1049-50). When Petitioner was interviewed shortly after his arrest, he falsely informed an agent that he had only a United States passport and that he no longer owned any Subway restaurant franchises. (Id. at 1026-32).

A grand jury indicted Petitioner and Qazah. (Id., Doc. No. 3: Indictment). In September 2012, Petitioner was charged in a superseding indictment with conspiracy to receive and transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371 (Count One);

4

money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (Count Twenty); and money laundering and aiding and abetting money laundering, in violation of 18 U.S.C. §§ 1956(a)(3) and 2 (Count 22). (Id., Doc. No. 192: Superseding Indictment). One of the allegations with respect to Count One was that Petitioner had helped unload cigarettes that were delivered on September 15, 2011. (Id. at ¶ 27). Petitioner moved to suppress the evidence obtained during the search of his residence. (Id., Doc. No. 227). This Court denied his motion after holding an evidentiary hearing. (Id., Doc. No. 289 at 52-64).

**C. Petitioner rejects the Government's plea offer and is convicted after trial.**

In December 2012, the Government offered Petitioner a plea agreement under which he would have pleaded guilty to conspiracy to commit money laundering (Count 20);[2] the parties would have recommended to the Court that the amount of loss attributable to Petitioner was between $1 million and $2.5 million; that a four-level enhancement for being in the business of money laundering applied, and that Petitioner would have been eligible for a three-level reduction for acceptance of responsibility, as well as an additional two-level reduction if he provided a truthful debriefing. (Doc. No. 5-1 at 6: Swerling Aff.). As part of this proposed plea agreement, the Government also agreed not to seek a four-level enhancement for being in the business of selling and receiving stolen property. (Id.). With truthful debriefing, Petitioner's total offense level would have been 21, which, with a criminal history category of I, would have resulted in an advisory guidelines range of 37-46 months of imprisonment. Without truthful debriefing, a 46- to 57-month sentence would have applied.

---

[2] Shortly before trial, the grand jury handed down a second superseding indictment, which contained the same charges against Petitioner, but in Counts One, Seven, and Nine. See (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. No. 245: Second Superseding Indictment).

Petitioner's counsel, Jack B. Swerling, met with Petitioner twice to discuss the proposed plea agreement. (Id.). Swerling advised Petitioner of the charge he would be pleading to, the effect of any cooperation, the advisory guidelines, as well as the service of his sentence. (Id. at 5). Swerling also discussed with Petitioner the consequences of proceeding to trial. (Id.). Petitioner rejected the proposed plea agreement at both meetings, stating that he did not want to cooperate and that the sentencing range was too high for his alleged conduct. (Id. at 6). Swerling proposed making counter-offers to the Government of a stipulation not to apply the four-level enhancement for being in the business of money laundering, or seeking an agreement to a two-year sentence. (Id.). However, Petitioner rejected these suggestions. (Id. at 6-7).

During Petitioner's trial, this Court inquired whether the parties had engaged in plea negotiations. (Id., Doc. No. 291 at 430). The Government summarized the terms of the December 2012 plea offer, and Petitioner told the Court that his counsel had presented this plea deal to him, but that he had rejected it after consulting with his family. (Id. at 432-34). This Court found that Petitioner "knowingly, intelligently and voluntarily rejected the plea offer made by the United States." (Id. at 434).

Petitioner and Qazah were tried together. During the six-day trial, the Government presented extensive evidence of their guilt, including testimony from the undercover officers who engaged in cigarette-trafficking and money-laundering transactions with the two men, as well as recordings and photographs of these meetings. See, i.e. (Id., Doc. No. 289 at 123-27; Doc. No. 291 at 617-29, 650-60). Swerling states in his affidavit that although he was suffering from knee pain and took over-the-counter Ibuprofen during the trial, his mind was clear and unaffected by the pain in his knee or the pain medication. (Doc. No. 5-1 at 1-2). He did not seek a continuance because his performance was unaffected, and the Court allowed him to sit down when any

6

weight bearing caused him discomfort.  (Id. at 2).

Qazah testified, but Petitioner did not.  (Id., Doc. No. 293 at 1053-54).  The defense had interviewed potential witnesses identified by Petitioner--Abrahim Pace and Carlos Hart--and had subpoenaed Pace to testify at trial.  (Doc. No. 5-1 at 3-4).  However, because the Government did not present evidence that Petitioner had helped to unload the cigarettes delivered on September 15, 2011, Swerling made the strategic decision not to call Pace as a witness, in order to prevent the Government from presenting such evidence on rebuttal.  (Id. at 4).  Swerling used this to Petitioner's advantage during closing argument, when he told the jury that the Government had offered no evidence that Petitioner had helped to unload the cigarettes, as was alleged in the Indictment.  (Id. at 4-5).  Ultimately, the jury convicted Petitioner on all counts.  (Id., Doc. No. 294 at 1575-78: Trial Tr. VI).

A probation officer prepared a presentence report and calculated Petitioner's base offense level as six, adding a 20-level enhancement because using the retail value of the cigarettes the amount of loss was over $7 million, and a two-level enhancement for being in the business of receiving/selling stolen property.  (Id., Doc. No. 329 at ¶ 47: PSR). The probation officer also recommended a two-level increase because Petitioner was convicted under § 1956, as well as another two-level increase because Petitioner used his commercial business nominees to launder money.  (Id. at ¶¶ 48-49).  Based on Petitioner's total offense level of 32 and his criminal history category of I, the advisory guidelines range was 121 to 151 months of imprisonment.  (Id. at ¶¶ 56, 60, 72, 73).  The probation officer also noted that Petitioner had a master's degree in mathematics and had completed one-year toward a doctorate in mathematics.  (Id. at ¶ 67). Petitioner objected to the sentence enhancements, including the loss amount, and sought a downward variance.  (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. Nos. 354, 423, 424).  He

again argued that there was no evidence that he had helped to unload the cigarettes in September 2011. (Id., Doc. No. 354 at 3).

In response, the Government presented testimony at sentencing from a former Charlotte-Mecklenburg police officer who had observed Petitioner help to unload a few palettes of cigarettes in September 2011. (Id., Doc. No. 510 at 56-57). This Court overruled Petitioner's objections to the PSR and determined that Petitioner was responsible for over $7 million in loss, that his criminal history category was I, and that his advisory guidelines range was 121-151 months of imprisonment. (Id. at 23-24, 74). Although noting that Petitioner was an "extraordinarily bright man," who had used his intelligence to further a criminal enterprise and had played an important role in the conspiracy, this Court granted a modest downward variance in light of Petitioner's favorable history and characteristics, as well as the limited need for deterrence. (Id. at 128-34). This Court sentenced Petitioner to 108 months of imprisonment. (Id. at 134). Qazah was found to be responsible for over $20 million in losses. (Id., Doc. No. 517 at 78). He was sentenced to 216 months of imprisonment. (Id. at 155).

**D. Petitioner appeals and stipulates to an 87-month sentence at resentencing.**

Petitioner appealed, challenging this Court's evidentiary rulings, as well as the use of the retail value of the cigarettes in determining the amount of loss. United States v. Qazah, 810 F.3d 879, 882 (4th Cir. 2015), cert. denied, 136 S. Ct. 2398 (2016). The Fourth Circuit affirmed his conviction, but vacated his sentence, remanding to allow this Court to make additional findings regarding the intended victims and the amount of loss. (Id. at 890, 892).

On remand, the parties agreed to sentences within the guidelines range for the amount of loss based on the wholesale value of the cigarettes. At Qazah's resentencing, which was held just before Petitioner's resentencing, the government recommended a 174-month sentence. (Doc.

No. 5-2 at 8: Gov. Ex. 2, Resent. Tr.).[3]  However, this Court imposed a 172-month sentence.  (Id. at 27-28).

At Petitioner's resentencing, the parties agreed that a two-level sentence reduction from the original sentencing range should apply.  (Id. at 5-7).  This resulted in a guidelines range of 87-108 months of imprisonment.  (Id. at 7).  Petitioner stipulated to an 87-month sentence, which is the sentence that the Government recommended and that this Court imposed.  (Id. at 32, 37; Doc. No. 5-1 at 8).  This Court advised Petitioner regarding the right to appeal.  (Doc. No. 5-2 at 39).  However, Sterling asserts in his affidavit that Petitioner never told Swerling that he wanted to appeal, Swerling did not believe that there was a basis for appeal, and a second appeal challenging the stipulated sentence was not filed.  (Doc. No. 5-1 at 9).

Petitioner timely filed the present motion to vacate in August 2016.  (Doc. No. 1-1).  In the motion to vacate, Petitioner contends that he received ineffective assistance of counsel because counsel allegedly did not adequately explain the proposed plea agreement (Claim III); did not call witnesses to testify at trial (Claim II); did not adequately cross-examine witnesses due to knee pain and because he was under the influence of medication (Claim I); and did not argue at resentencing that the parties had agreed that Petitioner's sentence should be half that of his co-defendant (Claim IV).  The Government filed its response and motion for summary judgment on November 28, 2016.  (Doc. No. 5).  On December 8, 2016, the Court entered a Roseboro order, and on December 19, 2016, Petitioner filed a Reply to the Government's response.  (Doc. Nos. 7, 9).

**II.      STANDARD OF REVIEW**

---

[3] The resentencing transcript is attached as Government Exhibit 2 to the Government's Motion for Summary Judgment.

**A. Section 2255**

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. If a petitioner's motion survives initial review and once the Government files a Response, the Court must then review the materials submitted by the parties to determine whether an evidentiary hearing is warranted under Rule 8(a) of the Rules Governing Section 2255 Proceedings. After having considered the record in this matter, including the parties' summary judgment materials, the Court finds that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

**B. Summary Judgment**

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

**III. DISCUSSION**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient

10

performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

In Missouri v. Frye, 132 S. Ct. 1399 (2012), and Lafler v. Cooper, 132 S. Ct. 1376 (2012), the Supreme Court held that a criminal defendant has a right to the effective representation of counsel during the plea-bargaining stage of the prosecution and that whether this right was abridged is governed by the familiar standard described in Strickland v. Washington. Frye, 132 S. Ct. at 1405-06; Lafler, 132 S. Ct. at 1384. In Frye, the Court held that this right is abridged when a defense lawyer allows a government offer to expire without advising the defendant of the offer or permitting him to consider the government's offer. Frye, 132 S. Ct. at 1408. In Lafler, the Court held that this right was abridged when a defendant rejected two plea offers based on counsel's advice that the prosecution would be unable to prove that he shot the victim with intent to murder her because the victim had been shot below the waist. Lafler, 132 S. Ct. at 1383. The parties in Lafler agreed that counsel's representation was

11

deficient when he advised the defendant to reject the plea offer on the grounds he could not be convicted at trial. Id. Applying Strickland, the Court in Lafler held that where a defendant argues that deficient advice resulted in his rejection of a favorable plea offer, he must show, in addition to the deficient advice, that (1) but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, (2) that the court would have accepted its terms, and (3) that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. Id. at 1385.

**A. Petitioner's contention that counsel did not adequately explain the proposed plea agreement. (Petitioner's Claim III)**

Petitioner first contends that he received ineffective assistance of counsel because counsel did not adequately explain the plea agreement. Defense counsel has a duty to inform his client of formal plea offers with favorable terms. Missouri v. Frye, 132 S. Ct. at 1408. Counsel is deficient if he fails to present a favorable plea agreement to his client or offers "gross misadvice" regarding his client's sentencing exposure. Id.; United States v. Merritt, 102 F. App'x 303, 307 (4th Cir. 2004). To show prejudice when a plea offer has been rejected, a "defendant[] must demonstrate a reasonable probability [he] would have accepted the earlier plea offer had [he] been afforded effective assistance of counsel," that the plea would have been accepted by the court, and that the plea would have been to a lesser charge or resulted in a lower sentence. Missouri v. Frye, 132 S. Ct. at 1409.

Here, Petitioner admits that counsel presented the plea offer to him, but he argues that counsel failed to fully and completely explain the plea agreement. (Doc. No. 1-1 at 8). He contends that counsel indicated that the plea offer was for three years of imprisonment, but that

12

counsel did not identify which offense he would be pleading guilty to. (Id.). He asserts that counsel did not explain the "collateral benefits" of the plea agreement, such as the fact that his sentence could be reduced for good-time credit or to a halfway house. (Id. at 8-9). Petitioner contends that if he had received this explanation, he would have pleaded "guilty to the offenses he was in fact guilty of." (Id. at 9). He also contends that if counsel had fully explained the advisory guidelines' applicable criminal history points and offense levels, this "would have impacted" his decision. (Id. at 10).

Petitioner has not shown deficient performance. As Swerling's affidavit shows, he fully advised Petitioner of the terms of the plea agreement, including the charge to which he was pleading, as well as the advisory guidelines and service of his sentence. (Doc. No. 5-1 at 5). Thus, there was no deficient performance. Moreover, Petitioner has not identified any constitutional duty of counsel to advise him of the possibility of receiving good-time credit or serving some time in a halfway house. See Hill v. Lockhart, 474 U.S. 52, 50 (1985) (declining to decide whether there might be circumstances under which erroneous advice regarding parole eligibility might support a claim of ineffective assistance). Petitioner was required to serve the vast majority of his sentence in custody, and any award of good-time credit would be speculative since it would depend on Petitioner's future conduct. See 18 U.S.C. § 3624. The Bureau of Prisons determines any award of good-time credit, as well as any release to a halfway house. Id. Good-time credit and the possibility of serving some time in a halfway house also applied to any sentence that Petitioner could have received after a trial, so there was no discrepancy in his weighing the relative weight of the possible sentences. Thus, even if Petitioner could show that counsel did not advise him of the potential for receiving good-time credit or time in a halfway house, he has not shown that this constituted "gross misadvice" regarding his sentencing

13

exposure.

Petitioner also cannot show prejudice. Petitioner's statement that he would have "plead[ed] guilty to the offenses he was in fact guilty of" shows his disinclination to plead guilty. (Doc. No. 1-1 at 9). As the jury's verdict shows, he was guilty of all of the charges against him. The fact that Petitioner was apprised at trial that the plea offer was to conspiracy to commit money laundering and he told the Court that he was rejecting this plea offer undermines his contention that he was willing to plead guilty to this charge. See (Crim. Case No. 3:11-r-373-FDW-DSC-10, Doc. No. 291 at 432-34). Additionally, Swerling's affidavit shows that Petitioner was not interested in pleading guilty even to a two-year sentence. (Doc. No. 5-1 at 6). Accordingly, Petitioner has not shown that there is a reasonable probability that he would have accepted the plea offer but for Swerling's performance. See Frye, 132 S. Ct. at 1408.

**B. Petitioner's claim that he received ineffective assistance of counsel because counsel did not call certain witnesses to testify at trial. (Petitioner's Claim II)**

Petitioner next contends that he received ineffective assistance of counsel based on counsel's failure to call witnesses to testify at trial. Complaints of ineffective assistance based on uncalled witness are disfavored because the presentation of witness testimony is a matter of strategy and the nature of such testimony is speculative. Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985). To demonstrate prejudice based on a claim of uncalled witnesses, a petitioner "must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." Id.; see Howard v. Lassiter, No. 1:12-cv-453, 2013 WL 5278270, at *3 (M.D.N.C. Sept. 18, 2013) (unpublished) (holding claim of uncalled witnesses failed where petitioner did not specify the identity of the witnesses, the substance of their anticipated testimony, or how this testimony would have produced a different outcome at trial).

14

A defendant claiming ineffective assistance of counsel based on an uncalled witness should make a proffer of testimony from the uncalled witness. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990).

Petitioner argues that he told counsel that several witnesses would have supported his contention that he was not involved in the part of the scheme alleging that he assisted in the handling and storage of cigarettes that were delivered to his business. (Doc. No. 1-1 at 4). He contends that counsel did not contact or subpoena witnesses germane to his defense. (Id. at 5). In particular, he contends that Carlos Hart and Ibrahiem Tace[4] could have testified that Petitioner did not assist in unloading cigarettes and could have testified as to "what actually occurred on" the date in question. (Id. at 7). He contends that the failure to rebut the testimony from the Government's witnesses constitutes ineffective assistance. (Id.).

As Swerling's affidavit shows, the defense team spoke with both Hart and Pace, and subpoenaed Pace to testify at trial. (Doc. No. 5-1 at 3-4, & exhs.). However, counsel made the strategic decision not to call Pace after the Government failed to present evidence that Petitioner had helped to unload cigarettes. (Id. at 4). This decision preserved the argument that Petitioner had not participated in the receipt of the stolen cigarettes as alleged in the Indictment and was objectively reasonable. See Strickland, 466 U.S. at 690 (recognizing informed strategic decision are "virtually unchallengeable"); Bunch v. Thompson, 949 F.2d 1354, 1364-65 (4th Cir. 1991) (holding counsel's strategic decision not to call witness was reasonable and did not constitute ineffective assistance). Thus, there was no deficient performance.

Petitioner also cannot show prejudice since he has not shown that Hart was available and

---

[4] Although the spelling is different, this appears to be the same witness that Swerling subpoenaed, Ibrahim Pace.

would have testified, nor what the substance of Hart or Pace's testimony would have been. Even taking as true Petitioner's conclusory assertion that they would have testified that Petitioner worked at the shopping center and had not assisted in unloading cigarettes, Petitioner has not shown there is a reasonable probability the result of the proceeding would have been different had such testimony been presented. Given that the Government did not present evidence that Petitioner helped to unload the cigarettes, testimony from Hart and Pace was unnecessary and might only have served to flag this omission for the Government, opening the door for this to be presented in rebuttal. See (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. No. 510 at 56-57: Sent. Tr.) (testimony from undercover officer at sentencing that Petitioner helped to unload the pallets of cigarettes). Additionally, this testimony would not have undermined the Government's evidence that Petitioner knew that Qazah was buying and selling "hot" cigarettes and was involved in these discussions, that he was helping Qazah by laundering funds from these transactions, and that he allowed delivery of the cigarettes and discussions of the sales to occur at his business. Because Petitioner cannot show deficient performance or prejudice, this claim is denied. See Strickland, 466 U.S. at 687-88, 694.

**C. Petitioner's claim that he received ineffective assistance of counsel because counsel's performance was hampered at trial due to knee pain and because he was under the influence of medication. (Petitioner's Claim I)**

Petitioner next contends that he received ineffective assistance of counsel because counsel's performance was hampered at trial due to knee pain and because he was under the influence of medication. To provide effective assistance of counsel, an attorney must be "present and attentive," as well as able to confer with his client. See United States v. Ragin, 820 F.3d 609, 619 (4th Cir. 2016) (internal quotation and citation omitted). However, even an attorney's

16

illness will not necessarily "impede a spirited defense." Bellamy v. Cogdell, 974 F.2d 302, 308 (2d Cir. 1992). Petitioner argues that trial counsel told him that he was in "severe and unbearable pain," and that counsel requested permission from the Court to remain seated during the trial proceedings. (Doc. No. 1-1 at 2). Petitioner contends that on January 22, 2013, almost a week before trial, counsel asked Petitioner for a pain reliever, Petitioner purchased a bottle of medicine from a pharmacy, and counsel used the entire bottle within a two-day period. (Id. at 2-3). Petitioner argues that after this counsel became "grumpy and non-communicative." (Id. at 3). He contends that counsel was not adequately prepared to present a defense and did not properly cross-examine witnesses. (Id.). Petitioner contends that if counsel had effectively cross-examined the witnesses, he could have received a different outcome based on his Rule 29 motion or the jury's verdict. (Id. at 3).

Petitioner has not shown deficient performance or prejudice. His conclusory contentions that counsel was not adequately prepared and did not properly cross-examine witnesses are insufficient to show deficient performance or prejudice. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations), cert. denied, 135 S. Ct. 47 (2014). Even if Petitioner had stated a sufficient claim, the record of the trial proceedings shows that counsel was prepared and engaged, made objections, and effectively cross-examined witnesses. See, i.e., (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. No. 292 at 713-38; Doc. No. 293 at 1152, 1159-66, 1250-52; Doc. No. 294 at 1544-46). The record also reflects that Petitioner never raised any concerns regarding his attorney's condition during trial or on appeal. Finally, Swerling's affidavit shows that his knee condition and any over-the-counter medicine that he took did not impair his mental faculties or his ability to effectively represent Petitioner. (Doc. No. 5-1 at 1-2). Because

17

Petitioner's claim that his attorney was impaired during the proceedings is conclusory and belied by the record, this claim is dismissed. See Dyess, 730 F.3d at 359-60; see also Mitchell v. United States, 432 F.2d 94, 95 (10th Cir. 1970) (holding that a trial court may take judicial notice of an attorney's competency at trial and that an evidentiary hearing was not required).

**D. Petitioner's claim that he received ineffective assistance of counsel at resentencing. (Petitioner's Claim IV)**

Petitioner next contends that he received ineffective assistance of counsel at resentencing. To establish ineffective assistance of counsel at sentencing, a petitioner must show that but for counsel's deficient performance, there is a reasonable probability that he would have received a lower sentence. See Royal v. Trombone, 188 F.3d 239, 249 (4th Cir. 1999). Petitioner cannot meet this standard where he stipulated to the sentence he received. Petitioner contends that, during the original sentencing, the parties agreed that he "could not receive any sentence that exceeded half of what co-defendant, Qazah received." (Doc. No. 1-1 at 10). Qazah was originally sentenced to 216 months of imprisonment, and Petitioner was originally sentenced to 108 months of imprisonment. (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. No. 510 at 134; Doc. No. 517 at 155). Petitioner asserts that the Government argued during resentencing that, based on the prior agreement, he should receive a sentence that was half of that imposed on Qazah. (Doc. No. 1-1 at 11). He contends that because Qazah was later sentenced to 172 months of imprisonment, his attorney should have brought this issue to the Court's attention, discussed the issue with Petitioner, or "note[d] an appeal" on this issue. (Id. at 11-12). Petitioner cannot show deficient performance or prejudice where he stipulated to an 87-month sentence. Although the Government argued that Petitioner was "about half as culpable as Mr. Qazah," Crim. Case No. 3:11-cr-3733:11-cr-373-FDW-DSC-10, Doc. No. 626 at 13-14, there

18

was no agreement that he could not receive a sentence that exceeded half of Qazah's. (Doc. No. 5-1 at 9: Swerling Aff.). It would have been impossible for the parties to make such an agreement because this Court determines the sentences to be imposed. The Government recommended a 174-month sentence for Qazah, but this Court imposed a slightly lower sentenced of 172 months. Contrary to Petitioner's contention that Qazah was resentenced after him, the record shows that Qazah was resentenced just before Petitioner. (Crim. Case No. 3:11-cr-373-FDW-DSC-10, Doc. No. 626 at 32: Resent. Tr.). Petitioner should have been aware when his sentence was imposed that his sentence was one month more than half of Qazah's sentence. However, he never raised this issue with Swerling, and any attempt to appeal this issue would have been futile given that he had stipulated to an 87-month sentence. In sum, because Petitioner can show neither deficient performance, nor that there is a reasonable probability that he would have received a lower sentence than the one to which he stipulated and that was at the bottom of the applicable guidelines range, this claim is dismissed. See Strickland, 466 U.S. at 687-88, 694.

## IV. CONCLUSION

For the reasons stated herein, the Court will deny and dismiss the § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED** with prejudice. To this extent, the Government's Motion for Summary Judgment, (Doc. No. 5), is **GRANTED**.

2. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller–El v.

Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: February 7, 2017

Frank D. Whitney
Chief United States District Judge